UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

REMO HARRISON DANIELS,

               Plaintiff,

v.                                            Case No. 17-cv-681-pp

KRISTINA deBLANC, *et al.*,

               Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 91) AND GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 131)**

The plaintiff is a Wisconsin state inmate and is representing himself. Magistrate Judge Nancy Joseph, the judge assigned to this case at the time, screened the plaintiff's amended complaint and allowed him to proceed on a claim that the defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical need and by failing to protect him from harm. Dkt. No. 52. Daniels filed a motion for summary judgment, dkt. no. 91, as did eleven of the twelve defendants, dkt. no. 95.[1] The court struck the defendants' motion because they combined their motion in this case with their motion in another case the plaintiff had filed, 17-cv-680. Dkt. No. 124. The defendants have re-filed their motion, dkt. no. 131, and the plaintiff has stated he will rely on his previously-filed response, dkt. no. 129. The court will deny the plaintiff's motion and grant the defendants' motion.

---

[1] The defendants conceded that there are genuine disputes of material fact as to defendant Keller. Dkt. No. 132 at 2.

## I. BACKGROUND INFORMATION

The plaintiff is an inmate at Green Bay Correctional Institution. Dkt. No. 97 ¶1; Dkt. No. 94 at ¶1. At the time relevant to this lawsuit, the plaintiff was incarcerated at Waupun Correctional Facility. Dkt. No. 97 at ¶1. The plaintiff has a complicated mental health history, which includes a history of threatening—and engaging in—self-harm. Id. at ¶2. According to the plaintiff, his "go-to" method of self-harm is overdosing. Id. at ¶3.

For safety reasons, an officer is not allowed to enter (or attempt to enter) an inmate's cell without back-up assistance from other officers. Id. at ¶5. In fact, it is impossible for an officer in the restricted housing unit ("RHU") to "key open" a cell. Id. at ¶6. Typically, a supervising officer and two to four officers are present before entering an inmate's cell. Id. at ¶7. The inmate could have a weapon, and inmates need to be restrained before being escorted to another part of the institution. Id. In the event there is blood in the cell, the health services unit ("HSU") may have to be called before entering the cell. Id. at ¶8. Sometimes, there are delays because officers are unavailable due to escorting inmates or entering another cell. Id. at ¶9. These precautions are in place for both the officers' and inmates' safety. Id. at ¶10.

Clinical observation status is a restrictive status used to prevent an inmate in imminent danger of inflicting harm on himself from doing so. Id. at ¶66. All property an inmate could use to inflict self-injury is removed from the cell and re-introduced only when his behavior and mental health improve. Id. There are two levels of observation status: close or constant. Id. at ¶13. "Close"

2

observation is the "standard" observation level and requires staff observation of inmates every fifteen minutes. Id. at ¶14. "Constant" observation is one-on-one continuous line-of-sight monitoring and requires that an officer be assigned to a specific inmate for observation. Id. Decisions regarding an inmate's method(s) of observation and restraint rest with the professional most qualified to diagnose and treat psychological conditions: Psychiatric Services Unit ("PSU") staff and physicians. Id. at ¶11. While any staff member may recommend that an inmate be placed on observation, those actually authorized to make the ultimate decisions include psychologists, psychological associates, crisis intervention workers and wardens. Id. at ¶12.

Staff employ constant observation when an inmate exhibits "imminent suicidal behavior." Id. at ¶15. Symptoms of imminent suicidal behavior include, but are not limited to: continued acts of self-harm despite being placed in a restrictive setting, such as observation; "access to object(s) that the inmate has on his person or finds in the cell; or, has a significant history of engaging in violent self-harm behaviors in the past."[2] Id. at ¶17.

The defendants assert that threats of self-harm are common in prison. Id. ¶20. At his deposition, the plaintiff agreed that it was common for inmates to shout out that they were going to harm themselves. Dkt. No. 90 at 16, Tr. Page 60, lines 16-19. The plaintiff points out that some inmates who shout out that they're going to harm themselves actually do harm themselves, or kill

---

[2] The court is not sure what the defendants meant here—perhaps they meant that an inmate who continuously makes efforts to obtain objects with which he can harm himself is subject to constant observation.

3

themselves. Dkt. No. 110 at ¶20. The parties dispute whether the plaintiff ever exhibited symptoms consistent with imminent suicidal behavior during the dates relevant to this case. Dkt. No. 97 at ¶16; Dkt. No. 110 at ¶16. They also dispute whether the plaintiff's acts of self-harm presented a low risk of serious injury. Dkt. No. 97 at ¶18; Dkt. No. 110 at ¶18. The defendants maintain that the plaintiff "frequently" harms himself for reasons other than suicidal ideation, including when he is "mad" at staff. Dkt. No. 97 at ¶23. The plaintiff doesn't dispute this, noting that he has serious mental illnesses that medication can't treat. Dkt. No. 110 at ¶23.

As Judge Joseph explained in her screening order, the plaintiff has alleged that twelve defendants were deliberately indifferent to his risk of suicide, either by failing to prevent harm or by providing deficient medical care, on two occasions: February 17, 2017 (and into the next day) and July 27, 2017. Dkt. No. 52 at 3-6. The plaintiff has made allegations regarding ten of the twelve defendants regarding the incident on February 17, 2017, id. at 7–8, and against the remaining two defendants with respect to the incident on July 27, 2017, id. at 10.

The court has incorporated the facts relevant to those incidents into its analysis.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Eighth Amendment Deliberate Indifference

The Eighth Amendment's prohibition on cruel and unusual punishment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "[D]eliberate

5

indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation omitted). "To establish an entitlement to damages [for deliberate indifference to a serious medical need], the prisoner must provide evidence that he presented an objectively serious medical need that a defendant correctional officer responded to with deliberate indifference, thereby resulting in some injury." Lord v. Beahm, 952 F.3d 902, 904 (7th Cir. 2020) (citation omitted). The plaintiff must show that "he suffered from an objectively serious medical condition" and that "a state official responded with deliberate indifference to the condition." Knight v. Grossman, 942 F.3d 336, 340 (7th Cir. 2019).

Similarly, a prison official's deliberate indifference to an inmate's substantial risk of serious harm—the official's failure to protect the inmate from that harm—also violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Again, the plaintiff's evidence must show that the defendants knew that the plaintiff was at risk of serious, imminent harm but that they were deliberately indifferent in failing to protect him from that harm. Harris v. Molinero, Case No. 18-3660, 2020 WL 630127, at *2 (7th Cir. Feb. 11, 2020) (citing Farmer, 511 U.S. at 837.

In their brief in support of their motion for summary judgment, the defendants discuss the second, subjective component of the deliberate indifference and failure-to-protect claims by citing cases in which the plaintiff's

6

serious medical need, or his substantial risk, was the risk of suicide. Dkt. No. 132 at 6. The court will analyze the claims accordingly.

Suicide is an objectively serious medical condition, and a prison official cannot intentionally disregard a known risk that an inmate is suicidal. Lord, 952 F.3d at 904. "At the second step, '[w]here the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk.' *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). This requires 'more than mere or gross negligence, but less than purposeful infliction of harm.' *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003))." Lisle v. Welborn, 933 F.3d 705, 716-17 (7th Cir. 2019).

    *1.    February 17, 2017*

The plaintiff was on observation status on February 17, 2017. Dkt. No. 97 at ¶65. Officials were checking on him every fifteen minutes. Id. at ¶66. Though inmates on observation status typically receive soft food trays, id. at ¶68, defendants Chad Geshcke and Doyal Johnson gave the plaintiff a hard food tray, id. at ¶67; dkt. no. 94 at ¶3. The defendants state that they gave him the tray mistakenly, dkt. no. 97 at ¶67, but the plaintiff—without evidentiary support—asserts that they knew he was not supposed to have a hard food tray, dkt. no. 110 at ¶67. The plaintiff tried to return the tray, asking "You want this tray back?" Dkt. No. 97 at ¶69. Geshcke and Johnson walked away, leaving open the trap door to the plaintiff's cell. Id. Defendant Jodi Tritt then walked

7

past the plaintiff's cell, and he told her what happened. Id. at ¶70. According to the plaintiff, Tritt closed the trap and walked away. Id.

Shortly after Tritt came by, defendant Nathan Pach went to the plaintiff's cell and asked for the tray. Id. at ¶71. The plaintiff tried to explain to Pach how he got the tray, but Pach said he didn't care and just wanted the tray back. Id. at ¶72. This made the plaintiff mad, so he started to harm himself with the tray. Id. at ¶73. The plaintiff first ate from the tray the food he wanted, leaving items he didn't like, then hit his left hand with the tray. Id. at ¶74. Though he had been prepared to give Pach the tray when he asked for it, the plaintiff changed his mind when Pach said that he didn't care how the plaintiff had gotten it. Id. at ¶75.

Pach reported the incident to defendant Sergeant Randall Bouzek, and Bouzek went to the plaintiff's cell and demanded the tray. Id. at ¶76; Dkt. No. 94 at ¶6. The plaintiff gave Bouzek the tray after saying something like, "take this fucking tray." Dkt. No. 97 at ¶77. The plaintiff was mad and wanted to see the Health Services Unit ("HSU") for his hand. Id. at ¶78. Bouzek told him to fill out a health services request or to talk to his "obs checker" during the next check. Id. The plaintiff described his injuries as "little marks" and "scratches," along with "a little swollen-ness but not bleeding." Id. at ¶79. The defendants assert that the plaintiff did not press the button in his cell for emergency medical attention. Id. ¶80. The plaintiff says he thinks he *did* push the button, but that when he was asked, he said he didn't because "remember lose." Dkt. No. 110 at ¶80.

8

After Bouzek left his cell front, the plaintiff was mad and used his fingernail to scrape his wrist so he could get medical care. Dkt. No. 97 at ¶81; Dkt. No. 94 at ¶6. He did not cut himself because he was suicidal, and he said he uses cutting as a "distraction" or to "de-stress." Dkt. No. 97 at ¶82. About twenty minutes later, a nurse saw and treated the plaintiff for his scratches, which required nothing more than steri-strips. Id. at ¶¶83–84. While in the treatment room, the plaintiff said that he overheard defendant Ryan Kuepper calling PSU to ask what should be done with respect to the plaintiff's placement. Id. ¶85. The plaintiff told Kuepper he intended to continue cutting himself. Dkt. No. 94 at ¶7. He heard Kuepper tell defendant Dr. Kristina deBlanc that he hit himself with his tray and "cut." Dkt. No. 97 at ¶85. The plaintiff assumes that deBlanc told Kuepper that the plaintiff could go back to his cell. Id. at ¶87. The defendants assert that because the plaintiff has agreed that it was appropriate for Kuepper to call the PSU, the defendants aren't sure what the plaintiff believes Kuepper did wrong. Id. at ¶88. The plaintiff says that under DOC policy, if an inmate on observation harms himself, not only should the PSU be contacted but the inmate's behavior management plan should be "in play." Dkt. No. 110 at ¶88. Officials returned the plaintiff to his cell and continued his observation placement with limited property. Id. at ¶89.

By midnight on February 17, defendant Anyssa Peters observed blood in the plaintiff's cell. Id. at ¶95; Dkt. No. 94 at ¶7. The plaintiff told her that he needed to be placed in full bed restraints. Id. (The defendants explain that bed restraints are a last resort to prevent an inmate from self-harming, because

9

they are the most restrictive measure and because they can pose risks. Dkt. No. 97 at ¶¶91-93.) Peters walked off (the plaintiff said she laughed before doing so) and a supervisor, defendant Kyle Keller, was at the plaintiff's cell front by 12:25 a.m. Id. at ¶96. The plaintiff says that Keller did nothing other than tell him that a nurse was not available and walk away. Id. at ¶97. By 1:00 a.m., someone notified Keller that the plaintiff continued to harm himself. Id. at ¶98. Keller and two other officers responded to the plaintiff's cell, ordered him to leave and escorted him to the strip cage. Id. Defendants Thomas Nelson and James Olson responded to the strip cage, and the plaintiff told them he wanted to be placed in bed restraints. Id. at ¶99. Nelson "apparently" said no. Id. at ¶100. The defendants point out, however, that a corrections officer does not have the authority to order bed restraints on his or her own. Id. at ¶101. At this point, the plaintiff had stopped engaging in self-harm. Id. at ¶102. He was able to walk to the strip cage on his own, stood for about an hour, used the restroom and communicated with Keller. Id. Olson then called deBlanc. Id. at ¶103. The officers ultimately put him back in his cell, and the plaintiff speculates that this is what deBlanc told them to do.[3] Id.

The plaintiff points out that a white inmate who was banging his head in his cell was placed on bed restraints, and he believes he was treated unfairly. Id. at ¶104. When a nurse came around to check on that inmate, she also checked on the plaintiff and cleaned and bandaged his arm. Id. at ¶105.

---

[3] The defendants did not include a declaration from deBlanc.

10

The three defendants who knew about the hard food tray but did not take it from the plaintiff (Geshcke, Johnson and Tritt) did not violate the Eighth Amendment. The plaintiff has produced no evidence to show that their giving him a hard food tray was anything more than a mistake—a negligent oversight. Negligence, even gross negligence, is not actionable under §1983. Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Leaving the tray with the plaintiff did not violate the Eighth Amendment. When Geschke and Johnson left the plaintiff's cell front, he asked if they were going to take the tray. Dkt. No. 97 at ¶69. He didn't threaten self-harm or otherwise indicate that he was going to misuse the hard food tray. The tray restriction is for all inmates on observation status. Id. at ¶68. It was not tailored to address only the plaintiff, or his past attempts at self-harm. Absent any evidence that Geschke and Johnson knew, or had reason to know, that the plaintiff intended to hurt himself with the tray, their leaving him with the tray did not constitute deliberate indifference. Pittman ex rel. Hamilton v. Cty. of Madison, Ill., 746 F.3d 766, 777 (7th Cir. 2014) (explaining that a defendant must be "aware of the facts from which the inference could be drawn that there was substantial risk of suicide and must also draw that inference.").

The same is true of Tritt. The plaintiff told her that Geshcke and Johnson had given him a hard food tray. The plaintiff has produced no evidence to show that Tritt was aware of any specific facts that would lead her to believe that he intended to harm himself with the tray, or that he *could* harm himself with it. In fact, the plaintiff didn't do anything with the tray until he started hitting

11

himself with it because he was mad. These defendants are entitled to summary judgment.

Once Tritt left and defendant Pach arrived, the plaintiff decided to use the tray to hit his hand when he got mad. Dkt. No. 97 at ¶¶71–73. The plaintiff took the time to eat what he wanted off his tray before beginning to hit himself. Id. at ¶74. The plaintiff's behavior was a tantrum, not a self-harm or suicide attempt. Pach had no warning that the plaintiff was going to hit himself with the tray—the plaintiff did not threaten to do so. But once the plaintiff did hit himself, Pach reported the incident to his supervisor. Id. at ¶76. The fact that Pach notified his supervisor shows the *opposite* of deliberate indifference. Pach is entitled to summary judgment.

Pach's supervisor, Bouzek, also is entitled to summary judgment. He came to the plaintiff's cell and took the tray from the plaintiff. Id. at ¶76; Dkt. No. 94 at ¶6. He was not involved in the plaintiff having the tray, and he wasn't present when the plaintiff started to hit himself with it. He took away the tray. There is no evidence to support the plaintiff's claim that Bouzek was deliberately indifferent to a risk of harm to the plaintiff with respect to the tray.

Nor is there a basis for determining that Bouzek was deliberately indifferent to the plaintiff's serious medical need. According to the plaintiff, hitting himself with the tray resulted in "little marks," "scratches" and some swelling. Dkt. No. 97 at ¶79. He does not allege he was in significant pain or offer any other information about his injuries. Marks, scratches and swelling do not constitute a serious medical need, and do not demonstrate evidence of

12

injury for which the plaintiff could recover damages. See Lord, 952 F.3d at 905 ("[The plaintiff's] physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage," which did not constitute "any cognizable harm.")

Even if the plaintiff had suffered an objectively serious injury from the tray, Bouzek wasn't deliberately indifferent to that injury—he instructed the plaintiff to either file a health service request or talk to the officer who was coming every fifteen minutes to do an observation check. Dkt. No. 97 at ¶78. A defendant is deliberately indifferent only if he acted with a sufficiently culpable state of mind, which requires that he act with something close to recklessness. Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) (internal citation omitted). Telling the plaintiff to file a request or speak with his observation checker is not recklessness. The plaintiff's tray-related injury was not life-threatening and, because Bouzek took the tray, it was not going to get worse. Bouzek had no reason to believe that the plaintiff was going to engage in more self-harm. Bouzek is entitled to summary judgment with respect to the tray and medical care.

Defendant Kuepper was the next defendant to interact with the plaintiff. Once Bouzek had taken away the tray, the plaintiff used his own nails to scrape his skin so he could get medical care. Dkt. No. 97 at ¶81; Dkt. No. 94 at ¶6. He doesn't dispute that he wasn't suicidal; he was distracting himself or de-stressing. Dkt. No. 97 at ¶82. Keupper and the plaintiff interacted once the plaintiff been taken to the nurse for treatment. Id. at ¶85. The plaintiff told

13

Kuepper that the plaintiff intended to continue to cut himself. Dkt. No. 94 at ¶7. Kuepper called PSU and spoke to deBlanc to ask what should be done, and ultimately took the plaintiff back to his cell. Dkt. No. 97 at ¶¶85, 87, 89. The plaintiff agrees that Kuepper did the right thing by calling PSU. Id. at ¶88.

The plaintiff asserts that DOC policy requires that when an inmate in observation self-harms, not only must the PSU be called but the inmate's behavior management plan must go into effect. He does not indicate who is required to implement this plan. He does not present proof that it was Kuepper's responsibility to implement that plan, or even that Kuepper had the ability to do so. He does not state any harm that he suffered from the failure to implement the plan (if, in fact, it was not implemented). Kuepper is entitled to summary judgment.

By midnight on February 17 (going into February 18), defendant Peters noticed that the plaintiff was continuing to cut himself and got a supervisor. Id. at ¶¶95–96. This did not constitute deliberate indifference. Peters had no ability to go into his cell. Id. at ¶6. Her only course of action was to get a supervisor, which she did. Peters is entitled to summary judgment.

Once the plaintiff was removed from his cell, he was taken to a strip cell where defendants Nelson and Olson met him Id. at ¶99. The plaintiff takes issue with Nelson for denying his request to be placed in full bed restraints. Id. at ¶100. But Nelson had no authority to order that the plaintiff be placed in bed restraints. Id. at ¶101. He cannot be liable for denying a request he did not have the authority to grant (particularly when bed restraints are to be used

14

only as a last resort). Olson called PSU and spoke with deBlanc. Id. at ¶103. Subsequently, the plaintiff was returned to his cell—by that time, he had calmed down, stopped self-harming, used the restroom and communicated with Keller. Id. at ¶102. While it is strange that the defendants did not provide a declaration from deBlanc, or any information about who decided that the plaintiff should be returned to his cell, the evidence shows that Olson did not ignore the plaintiff's situation—he called the PSU and spoke with deBlanc. Both he and Nelson are entitled to summary judgment.

Defendant Keller has not sought summary judgment in his favor, but the plaintiff has asked the court to grant summary judgment *against* Keller. Keller interacted with the plaintiff in the early morning hours of February 18, 2017, after the plaintiff began cutting again. When Keller first arrived at the cell, he told the plaintiff a nurse was not available and walked away. Id. at ¶97. Someone then informed Keller that the plaintiff was continuing to harm himself, and Keller got the plaintiff out of his cell and took him to a strip cage by 1:00 a.m. Id. at ¶98. There appears to be genuine dispute as to what Keller knew and whether his actions constituted deliberate indifference. The court will deny the plaintiff's request for summary judgment as to Keller.

There is a procedural muddle as to defendant deBlanc. In his amended complaint, the plaintiff alleged that after Kuepper called the PSU, deBlanc "said put [him] back in [his] cell, when she was aware of [the plaintiff] saying [he] was not going to stop doing self-harm." Dkt. No. 43 at 2. He also alleged that when Olson called the PSU, deBlanc "said put [the plaintiff] back in [his] cell."

15

Id. at 3. In his brief in support of his motion for summary judgment, the plaintiff stated:

> Dr. DeBlanc, was aware of my Behavior Management Plan, on 7-19-17, she knew I have no plan to stop harming myself but she didn't care. She place a white inmate in full bed restrain[t] to stop him from harming his self. But no care for me. No disputed the MMP. Dr DeBlanc was fully aware that was my 3 or 4 times self-injury. She was fully aware of my history with self-harm. Based on these facts Dr. DeBlanc was aware Daniels was at a risk of committing suicide or engaging in self harm.
>
> ***
>
> Dr Deblanc knew of a substantial risk that Daniels would keep harming himself. For these reason, Mr. Daniels is entitled to summary judgment.

Dkt. No. 92 at 6–7.

Thus, in his amended complaint, the plaintiff alleged that based on his assumptions about what deBlanc said to Kuepper and Olson, deBlanc was deliberately indifferent on February 17 and 18. In his summary judgment brief, he implies that she was deliberately indifferent sometime after July 19, 2017.

The defendants made no reference to deBlanc in their brief opposing the plaintiff's motion. Dkt. No. 113. They cited cases holding that inmates who pose substantial risks to themselves have the right to treatment, which may include bodily restraint. Id. at 6 (citing Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 262 (7th Cir. 1994) (citing Youngberger v. Romeo, 457 U.S. 3-7. 322–23 (1982))). They also point out that inmates have a right to be free from unnecessary restraints, and argue that where those rights conflict, there is a need to balance them against each other. Id. But they say nothing about deBlanc specifically.

Nor do they address deBlanc specifically in their brief in support of their motion for summary judgment. Dkt. No. 132. And they did not provide a declaration from deBlanc or Kuepper or Olson, so the court has no information about what deBlanc may have told Kuepper or Olson on February 17 and 18. It would have helped the court had the defendants addressed the plaintiff's allegations and arguments as to deBlanc. But because the plaintiff's allegations against deBlanc are based solely on assumptions, and because he has not described any harm that he suffered as a result of what he assumes were deBlanc's directions to Kuepper and Olson, the court must grant summary judgment in favor of deBlanc.

2.  *July 27, 2017*

The plaintiff has sued defendants Carlyn Voigt and Nelson for events that occurred on July 27, 2017. At approximately 10:00 a.m. that day, the plaintiff was released from observation status. Dkt. No. 97 at ¶106. He believes that defendant Voigt "ordered paper and books from his cell," so the plaintiff got back to the cell and got angry. Id. at ¶107. To show how mad he was, the plaintiff pushed his intercom and said that he was going to self-harm. Id. at ¶108. He started cutting himself with a pen. Id. at ¶109. Officer Hess (not a defendant) saw the plaintiff and ordered him to stop. Id. at ¶110. The plaintiff complied on the second order and was placed in an observational cell after a strip search. Id. Nelson and Voigt saw the plaintiff in the strip cage. Id. at ¶111. He was able to walk on his own from his cell to the strip cage and

17

participate in a self-directed strip search. Id. Staff found the pen the plaintiff had used to cut himself and removed it from his cell. Id. at ¶112.

The plaintiff ate some lunch and then started cutting again at 11:20 a.m. (though he doesn't recall what he used to cut himself). Id. at ¶113. In response to this second cutting incident, Voigt contacted Nelson and the plaintiff was placed in "hand cans"—protective mitts. Id. at ¶¶114-115. Mechanical restraints—such as bed restraints, restraint chairs and hand cans—are temporary measures to use until staff can manage behavior with less restrictive means. Id. at ¶116. Before staff put the hand cans on the plaintiff, someone cleaned and bandaged his cuts. Id. at ¶119. The plaintiff says he should've been placed in full bed restraints so that he wouldn't jump off his bed or the sink. Id. at ¶120. (The plaintiff didn't do either of those things or engage in further self-harm. Id. at ¶121.)

The plaintiff has not identified anything that Voight did to show deliberate indifference to a substantial risk to his safety. He *believed* that she had done something in his cell, and he got mad. The plaintiff has presented no evidence that Voight did anything in his cell, and if he had, that would not make Voight liable for his reaction to what she did. Nor are Voigt or Nelson liable for what happened after lunch, when the plaintiff began cutting himself again. Far from being deliberately indifferent, Voigt contacted Nelson and the plaintiff was put in hand cans. The plaintiff contends that he should have been placed on bed restraints, based both on his behavior management plan and his

18

request. Neither Voigt or Nelson had the authority to order that the plaintiff be placed on bed restraints. Officers do not have that authority. Id. at ¶101.

Even if Voigt and Nelson had possessed the authority to put the plaintiff in bed restraints, the plaintiff has presented no evidence that the decision to use a less restrictive means of restraint was deliberately indifferent. The hand cans prevented the plaintiff from engaging in further self-harm. And though the plaintiff believes he needed the full bed restraints because he could have jumped off his bed or sink, he didn't do either of those things. Even if an officer is deliberately indifferent to a serious medical need or risk, a plaintiff cannot recover damages for exposure to that risk if he didn't suffer an injury. Lord, 952 F.3d at 905.

The plaintiff also says that Nelson's incident report contained inaccuracies. Dkt. No. 92 at 10. He says that Nelson did not give him medical care at 10:30 a.m. (the report says he did). Dkt. No. 93 at ¶11. The medical records show that HSU saw the plaintiff at 7:55 a.m. and 12:10 p.m. on July 27, 2017. Dkt. No. 93-1 at 19. Neither party provided the court with a timeline, so the court cannot discern a discrepancy. Regardless, the plaintiff appears to believe that the alleged inaccuracies should undermine Nelson's credibility. Dkt. No. 92 at 10. But none of the facts on which the court relies are disputed. There is no need for the court to make a credibility determination.

Finally, the court notes that the plaintiff makes mention of a white inmate receiving different treatment. Dkt. No. 92 at 3. Specifically, he points out that a white inmate who was banging his head in his cell was placed on

bed restraints. Dkt. No. 97 at ¶104. The plaintiff has not alleged an equal protection claim, and the court did not allow him to proceed on such a claim.

## II. CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 91.

The court **GRANTS** the defendants' motion for partial summary judgment. Dkt. No. 131.

The court **DISMISSES** deBlanc, Olson, Kuepper, Nelson, Tritt, Bouzek, Geschke, Johnson, Pach, Peters and Voigt.

The court will schedule a telephone status conference with the parties to determine next steps regarding the plaintiff's claim against defendant Keller.

Dated in Milwaukee, Wisconsin, this 31st day of March, 2020

        **BY THE COURT:**

        _____
        **HON. PAMELA PEPPER**
        **Chief United States District Judge**